IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

|  |  |
|---|---|
| THE FORTEGRA GROUP, INC., and LOTSOLUTIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PINION RISK CONSULTING LIMITED, PINION US SERVICES LLC, PINION US HOLDINGS LLC d/b/a PINION INSURANCE, JOEL VAAG, KYLE SELVIG, AND LAURA BAIRD, <br><br> Defendants. | Civil Action No. _____ |

## VERIFIED COMPLAINT

Plaintiffs The Fortegra Group, Inc. ("Fortegra Group"), and LOTSolutions, Inc. ("LOTSolutions") (collectively, "Fortegra" or "Company"), by and through undersigned counsel, file this Verified Complaint against Defendants Pinion Risk Consulting Limited ("Pinion Risk"), Pinion US Services LLC ("Pinion Services"), Pinion US Holdings LLC ("Pinion Holdings") (collectively, "Pinion" and d/b/a Pinion Insurance), Joel Vaag ("Vaag"), Kyle Selvig ("Selvig"), and Laura Baird ("Baird") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.    This case arises from an ongoing and coordinated scheme by multiple Fortegra executives and a senior Pinion executive to steal Fortegra's trade secrets and

use them to launch a competing insurance platform in the United States. While serving as Fortegra's Executive Vice President and Chief Actuary, Joel Vaag secretly aligned himself with Laura Baird, Pinion's Chief Technology Officer and Co-Founder, and worked in concert with Kyle Selvig, Fortegra's Vice President of Commercial Underwriting, to misappropriate Fortegra's most sensitive proprietary information. Defendants then used that information to assist Pinion in building a competing business to compete unfairly against Fortegra. Acting in concert and under the internal project name "Project Clover," Defendants targeted Fortegra's core business intelligence, including underwriting methodologies, pricing frameworks, MGA and carrier performance data, reinsurance strategies, and multi-year financial projections. Defendants used that information to accelerate Pinion's market entry and eliminate the need to independently develop those capabilities, including by targeting Fortegra's existing program partners and relationships.

2.      This was not permissible competition or routine employee conduct. It was a calculated misuse and misappropriation of Fortegra's trade secrets while Vaag and Selvig remained in key positions of trust, with access to Fortegra's most valuable information. From at least June 2025 until his resignation in March 2026, Vaag systematically extracted proprietary materials and transmitted them to his personal accounts and devices for use by Pinion, including by sending multiple, sensitive spreadsheets and other files from his Fortegra email account to his personal email account. Vaag misappropriated materials that were neither general knowledge nor publicly available. They consisted of highly specific, non-public business information

2

that derives independent economic value from its secrecy and that Fortegra takes reasonable and affirmative measures to protect. These materials include proprietary actuarial models, underwriting guidelines, detailed financial projections, and comprehensive performance data across Fortegra's insurance programs and relationships.

3.      Defendants used this information in real time to build the groundwork for Pinion's insurance operations in the United States, United Kingdom, and the European Union. Among other things, Vaag transmitted financial models and projections spanning multiple years, including materials prepared for capital adequacy analysis and rating agency review. These materials were used to develop Pinion's business plan, structure its underwriting approach, and establish its financial projections. They were also used in connection with planning and building Pinion's U.S. operations while Vaag and Selvig remained employed by Fortegra. Defendants' conduct was coordinated and deliberate. Vaag and Baird developed a close, personal relationship when she provided Fortegra actuarial and analytical services through a predecessor of Pinion. As that consulting relationship began to conclude in June 2025, Vaag continued communicating directly with Baird while misappropriating Fortegra's information, including to schedule and participate in secret meetings concerning Pinion's development. By July and August 2025, Defendants were actively building Pinion's underwriting framework and operational model using Fortegra's proprietary information.

4.      Selvig's involvement was not incidental or post-employment. As early as July 22, 2025, while still employed by Fortegra, Selvig drafted and transmitted to himself an email containing a professional biography describing his transition "from Fortegra" to ultimately become the future U.S. Chief Underwriting Officer of Pinion, an entity that did not yet exist. This confirms that Selvig was actively participating in Project Clover and assisting in the development of Pinion's competing platform months before his resignation from Fortegra.

5.      Defendants' actions have provided Pinion with a substantial and unlawful head start and pose an immediate and irreparable competitive threat to Fortegra. Absent Defendants' misconduct, Pinion would have been required to expend significant time, resources, and expertise to develop the models, data, and strategies necessary to enter the market. Instead, Defendants used Fortegra's trade secrets and decades of success as a blueprint. Defendants' misappropriation is ongoing and poses an immediate threat of continued use and disclosure of Fortegra's trade secrets, including in connection with efforts to solicit Fortegra employees and solicit and develop business with Fortegra's existing partners. Monetary damages alone cannot remedy the harm caused by the loss of control over proprietary information, the erosion of competitive advantage, and the risk that Defendants will continue to use Fortegra's information to compete directly against it.

6.      Defendants' possession of Fortegra's trade secrets is not historical. It is current, ongoing, and embedded in Pinion's business. The materials misappropriated by Selvig and Vaag were used to develop Pinion's underwriting framework, financial

models, reinsurance structures, and organizational design, and those same materials continue to inform Pinion's operations as it prepares to bind business in the United States. Absent immediate injunctive relief, Defendants will continue to use Fortegra's trade secrets in connection with ongoing discussions with managing general agents ("MGAs") and program development efforts.

7.      Fortegra brings this emergency action to immediately enjoin Defendants from further use or disclosure of its trade secrets, compel the return and destruction of all misappropriated information, and recover damages resulting from Defendants' unlawful conduct.

## PARTIES

8.      Plaintiff Fortegra Group is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jacksonville, Florida. Fortegra is a specialty insurer that develops and underwrites customized insurance and warranty products, including service contracts and niche commercial coverages, often distributed through partnerships and embedded channels. It also partners with MGAs, providing underwriting capacity, program oversight, and data-driven pricing to drive disciplined, profitable growth in targeted markets.

9.      Plaintiff LOTSolutions is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Jacksonville, Florida. LOTSolutions is an affiliated subsidiary of Fortegra and operates as a non-insurance services affiliate within the Fortegra enterprise, providing administrative

and operational support functions in connection with insurance products, including serving as a third-party administrator for claims handling and related services.

10. Defendant Vaag is a former Executive Vice President and Chief Actuary of Fortegra. Vaag is a resident of the State of Florida with residences in Jacksonville, Florida and Fairfield, New Jersey. Vaag was employed by Plaintiff LOTSolutions.

11. Defendant Selvig is a former Vice President of Commercial Underwriting of Fortegra. He is now employed by Pinion as its U.S. Chief Underwriting Officer. Selvig is a resident of the State of Florida with a residence in Saint Johns, Florida.

12. Defendant Baird is the Chief Technology Officer and Co-Founder of Pinion Insurance. She also founded Pinion's predecessor/affiliate, Pinion Risk, and, upon information and belief, Pinion Services and Pinion Holdings. Upon information and belief, Baird is a citizen of the United Kingdom and resides in London, England.

13. Defendant Pinion Risk is a company organized under the laws of England and Wales with its principal place of business in London, England. Pinion Risk was founded by Baird and remained wholly owned by her until February 13, 2026. On that date, Baird transferred ownership of Pinion Risk to Pinion UK Services Limited ("Pinion UK Services"), a company organized under the laws of England and Wales with its principal place of business in London, England. Upon information and belief, Pinion UK Services was formed on or about December 9, 2025, in connection with the launch of "Pinion Insurance," a newly established insurance platform, and Baird serves as its Company Director.

6

14.     Defendants Pinion Services and Pinion Holdings are limited liability companies organized and existing under the laws of the State of Delaware. Upon information and belief, both entities were formed on or about December 11, 2025, in the United States as part of the launch of Pinion Insurance. Upon information and belief, Pinion Services and Pinion Holdings were created to serve as U.S.-based operating and holding entities, respectively, in furtherance of that venture, and are affiliates of Pinion Risk.

### JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District and Fortegra's principal place of business is located here.

18.     This Court has personal jurisdiction over Defendant Vaag because he was employed by LOTSolutions in Jacksonville, Florida, maintains a residence in Florida, and directed the conduct at issue toward Florida. Vaag accessed, misappropriated, and transmitted Fortegra's trade secrets while in Florida and through systems located in Florida and directed those acts at his Florida-based employer, causing injury in Florida. Vaag's conduct therefore subjects him to jurisdiction under

Florida's long-arm statute, including Fla. Stat. § 48.193(1)(a)(2). The exercise of jurisdiction comports with due process because Vaag purposefully availed himself of the privilege of conducting activities in Florida and could reasonably anticipate being brought into court here.

19.     This Court has personal jurisdiction over Defendant Selvig because he is a resident of Florida and is therefore subject to general personal jurisdiction in the State of Florida. In addition, Selvig accessed, used, and misappropriated Fortegra's confidential and trade secret information while located in Florida and directed that conduct toward a Florida-based employer. His conduct subjects him to jurisdiction under Fla. Stat. § 48.193(1)(a)(2). The exercise of jurisdiction also comports with due process because Selvig is domiciled in Florida and engaged in conduct there giving rise to this action, such that he could reasonably anticipate being brought into court here.

20.     This Court has personal jurisdiction over Defendant Baird because Baird, acting individually and on behalf of Pinion and its affiliated entities, purposefully directed tortious conduct toward Florida and knowingly participated in the misappropriation of Fortegra's trade secrets from a Florida-based company. Baird coordinated with Vaag while he was employed in Florida, received or had access to information she knew was taken from Fortegra in Florida, and participated in a scheme designed to cause harm to Fortegra in this District. Baird's conduct subjects her to jurisdiction under Fla. Stat. § 48.193(1)(a)(2), and the exercise of jurisdiction over her comports with due process because her actions were expressly aimed at Florida and she knew the brunt of the harm would be suffered here.

21. This Court has personal jurisdiction over Defendant Pinion for multiple independent reasons.

22. First, Pinion is bound by the forum selection clause contained in the February 8, 2023 Client Agreement (the "Client Agreement") between Fortegra Group's affiliate, LOTSolutions, and Pinion Risk, an entity founded by Baird. A true and correct copy of the executed Client Agreement is attached hereto as Exhibit A. The Client Agreement was executed in connection with services directed to Fortegra's operations in Jacksonville, Florida, and governs the relationship through which Defendants Pinion and Baird initially obtained access to Fortegra's proprietary information. The Agreement further provides that it is binding on the parties and their successors, assigns, and affiliated entities. Following the February 13, 2026, transfer and the launch of Pinion Insurance, Pinion succeeded to, continued, and/or operated as part of the same affiliated enterprise as Pinion Risk, and is therefore bound by the Agreement's terms, including its forum selection provision.

23. Second, Pinion, through Baird and others acting on its behalf, purposefully directed tortious conduct toward Florida by participating in, facilitating, and benefiting from the misappropriation of Fortegra's trade secrets. Pinion worked in concert with Vaag while Vaag was located in Florida, used information taken from Fortegra in Florida, and targeted Fortegra, a Florida-based company, as the victim of its conduct. These actions subject Pinion to jurisdiction under Fla. Stat. § 48.193(1)(a)(2).

24.     Third, Pinion's conduct satisfies due process because it purposefully availed itself of the privilege of conducting activities in Florida, including through its relationship with Fortegra and its exploitation of Fortegra's Florida-based operations and information, and it could reasonably anticipate being brought into court in this District.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the misappropriation of trade secrets, the transmission of proprietary information, and the resulting harm to Fortegra.

26.     Venue is further proper because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**A.     Fortegra's Business, Competitive Position, and Trade Secrets**

27.     Fortegra is a sophisticated insurance enterprise that operates in a highly specialized and intensely competitive market. Its business depends on the development, protection, and disciplined use of proprietary underwriting strategies, actuarial methodologies, pricing models, reinsurance structures, MGA diligence processes, carrier performance analytics, reserve and profitability analyses, and forward-looking financial planning.

28.     Over time, Fortegra has invested substantial time, money, and expertise to develop proprietary frameworks and analytical tools that allow it to evaluate new MGA opportunities, assess risk, structure underwriting guidelines, price business,

manage capacity, monitor profitability, and identify underperforming or high-potential programs. Those frameworks are the product of years of internal work, market experience, actuarial judgment, claims experience, loss development analysis, and strategic planning.

29.    Fortegra's confidential and trade secret information includes, among other things: underwriting rules and guidelines; pricing models and pricing strategies; actuarial workflows and reserve processes; loss picks; profitability analyses; BCAR-related modeling; reinsurance structures and strategies; MGA reconciliations and oversight processes; due diligence checklists and deal-evaluation procedures; segment and program-level financial results; loss triangles and development curves; Catastrophy or "CAT" exposure and modeling strategies; large loss reports; program-specific rate history; business plans and forecasts; and internal information concerning personnel, department roles, and the organizational infrastructure supporting those functions, as well as program-level performance data. Those categories were also among the information Fortegra shared with Pinion Risk under the parties' consulting relationship and that the Client Agreement expressly protected as Fortegra's confidential and proprietary information.

30.    Fortegra's trade secrets are used in, and are intended for use in, interstate and foreign commerce. Indeed, Fortegra routinely uses its proprietary underwriting models, actuarial analyses, pricing strategies, and reinsurance structures in connection with cross-border insurance and reinsurance transactions, including relationships with international reinsurers and global capital providers and submissions to internationally

recognized rating agencies. These activities require the application of Fortegra's confidential methodologies and data to structure and evaluate risk across multiple jurisdictions.

31.    This information is not publicly available. It cannot be assembled from public sources or duplicated without extraordinary effort. It reflects Fortegra's internal business judgments about how to assess risk, deploy capital, structure reinsurance, underwrite programs, and identify attractive and unattractive business opportunities in the MGA-focused insurance market.

32.    The secrecy of that information gives Fortegra a substantial competitive advantage. It allows Fortegra to evaluate and win desirable opportunities, avoid unfavorable risk, respond to performance trends more quickly than competitors, and make disciplined strategic decisions that would not be possible without access to Fortegra's internal data and methodologies.

33.    Fortegra takes reasonable and appropriate measures to protect the secrecy of its trade secrets and confidential information. Fortegra limits access to sensitive information to personnel with a business need to know, maintains secure internal systems, imposes confidentiality and information-security obligations on employees and contractors, restricts external transmission of confidential information, and classifies particularly sensitive materials as Restricted, Confidential, and/or Proprietary.

34.    Fortegra does not treat its confidential and trade secret information casually. It maintains written information security, confidentiality, and business-

conduct policies designed to protect the confidentiality, integrity, and security of its information assets. These policies limit access to confidential and trade secret information to authorized personnel with a legitimate business need, regulate the storage, transmission, and handling of non-public information, and reduce the risk of unauthorized disclosure, misuse, alteration, or destruction of sensitive data. Fortegra's information security program is overseen by designated leadership and supported by an Information Security Team, annual risk assessments, access-control requirements, encryption, logging, authentication controls, and other administrative, technical, and organizational safeguards.

35. Fortegra classifies data by sensitivity and requires that information be handled according to the highest applicable classification. Its Information Security Policy identifies "Restricted/Proprietary," "Confidential," "Sensitive," and "Public" data classes, and specifically recognizes that highly sensitive non-public company documents, strategic plans, partnership agreements, underwriting algorithms, calculation models, financial data, legal files, and M&A materials require the highest level of protection. Access to such information is limited to authorized personnel, may be restricted by job function or department, and is governed by need-to-know principles and role-based access controls.

36. Fortegra's policies further require that non-public electronic information remain within secure systems, prohibit transferring protected information to systems that do not meet Fortegra's security requirements without advance approval, require secure methods for exchanging protected information with third parties, and mandate

controls such as encryption, multi-factor authentication, password protections, logging, and audit trails. Fortegra also requires third parties with access to sensitive data to be subject to contractual confidentiality and information-security obligations.

37. Fortegra requires employees to acknowledge and attest to their understanding of its confidentiality and security protocols, and to undergo training on the protocols on an annual basis. It also requires employees and contractors to acknowledge and comply with its Information Security Policy and related acceptable-use restrictions. Among other things, Fortegra's policies prohibit use of Fortegra trade secrets, confidential information, sensitive information, or other proprietary data for oneself or others, require the return of Company documents and property at separation, prohibit retention of copies, notes, or abstracts, and expressly provide that Fortegra may seek injunctive relief for breach.

38. Vaag and Selvig were repeatedly reminded of these obligations. Vaag most recently acknowledged receipt of Fortegra's Information Security Policy on April 5, 2025, and Fortegra's Code of Business Conduct and Ethics on January 15, 2025. Selvig most recently acknowledged receipt of Fortegra's Information Security Policy on May 12, 2025, and Fortegra's Code of Business Conduct and Ethics on January 24, 2025. True and correct copies of Fortegra's Information Security Policy and Code of Business Conduct and Ethics, each in effect during the relevant time period, are attached hereto as Exhibits B and C, respectively.

39. The Code required Vaag and Selvig to act fairly and honestly, comply strictly with Company policies, avoid actions reflecting unfavorably on their integrity

or the Company's integrity, and refrain from taking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, or other unfair dealing practices. It also prohibited Fortegra personnel from seeking competitive advantages through illegal or unethical business practices. Fortegra's senior executives, including Vaag and Selvig, were subject to stringent obligations to protect Fortegra's confidential and proprietary information, use that information only for Fortegra's benefit, and refrain from transmitting it outside authorized channels.

**B.     Vaag's Position of Trust and Access to Fortegra's Most Sensitive Information**

40.     Vaag was employed by Fortegra from September 2019 through April 3, 2026.

41.     Beginning in August 2023, Vaag served as Fortegra's Executive Vice President and Chief Actuary. His responsibilities included, but were not limited to, establishing and maintaining appropriate loss reserves; providing actuarial opinions on reserve adequacy; supporting financial reporting by assessing the sufficiency of reserves and capital requirements; developing and oversight of pricing models for the Company's insurance products, and helping the Company enter new markets and refining existing offerings with an understanding of risk and profitability. Vaag's critical role placed him near the center of Fortegra's business operations and had exceptional access to Fortegra's most sensitive strategic, actuarial, financial, and underwriting information.

15

42. As EVP and Chief Actuary, Vaag had access to Fortegra's internal actuarial processes, reserve and pricing analyses, underwriting strategies, reinsurance structures, MGA program results, profitability data, and forward-looking models. He also had visibility into Fortegra's organizational structure, staffing, leadership responsibilities, and strategic initiatives. In his role, he not only routinely attended board meetings for Fortegra's individual insurance subsidiaries or "statutory companies,", but also attended Fortegra's annual strategic executive team meetings, serving as a key advisor to executive leadership by providing insight into the profitability of business lines, evaluating opportunities for growth, and helping define the Company's overall risk appetite. Moreover, he served as a director of Fortegra Specialty Insurance Company and Chief Risk Officer of Fortegra Insurance UK Ltd, the UK-based insurance carrier subsidiary of the broader Fortegra Group that provides underwriting capacity for program business distributed through MGAs and other intermediaries.

43. Vaag occupied a position of extraordinary trust. Fortegra relied on him not merely to safeguard confidential information, but to use his judgment and access such information solely for Fortegra's benefit. He owed Fortegra fiduciary duties of loyalty, honesty, candor, and good faith, and he was prohibited from misusing Fortegra's proprietary information for his own benefit or for the benefit of a competitor.

44. By virtue of his senior executive role, Vaag was not merely generally aware of Fortegra's confidentiality expectations. He was subject to specific written

policies, including Fortegra's Code of Business Conduct and Ethics (the "Code"), governing the handling of confidential and proprietary information, the use of Fortegra's systems, the transmission of non-public data, and ethical obligations prohibiting misuse of privileged information or unfair competitive conduct. The Code expressly provides that "[n]o employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice." It also states the Company "does not seek competitive advantages through illegal or unethical business practices" and provides that employees "may use [confidential information] only for a proper business purpose related to the Company" and "should not use or disclose confidential information…to further any private interest or to make any personal gain." His later forwarding of Fortegra's confidential information to his personal email account and his work on behalf of Pinion while still employed by Fortegra were undertaken in direct violation of these duties and restrictions.

45. Because of Vaag's role, any misuse of Fortegra's information by him was particularly dangerous. He had unfettered access to the very materials that reveal how Fortegra evaluates opportunities, selects and prices risk, structures its capacity, monitors performance, and builds its business. That access to Fortegra's confidential information and trade secrets also gave him insight into Fortegra's existing program partners, such as MGAs and other distribution partners through which Fortegra underwrites and administers insurance programs, and their performance.

17

**C.    Selvig's Position of Trust, Access to Fortegra's Most Sensitive Information and Departure**

46.    Kyle Selvig was employed by Fortegra from approximately May 23, 2016 through December 13, 2025.

47.    At the time Selvig resigned from Fortegra, he served as VP of Commercial Underwriting, through which he managed approximately $100 million in gross written premiums across multiple commercial and personal property and casualty programs.

48.    In that role, Selvig's responsibilities included, but were not limited to, developing and executing plans to develop and drive new and renewal business globally with a particular focus on the US, Europe and Asia; managing and underwriting deals, including risk assessment, pricing, negotiation and closing; managing the relationships with distribution channels and clients during underwriting, deal implementation and ongoing deal management stages; evaluating and rating risk to determine acceptability, coverage and pricing for current and proposed products and business; building relationships with assigned brokers and clients to meet and/or exceed divisional growth goals; and negotiating with producers within limits of delegated authority in accordance with established underwriting standards to achieve profitable objectives for the Company.

49.    Through his employment, Selvig had access to Fortegra's confidential and proprietary information concerning underwriting strategy, MGA relationships, program performance, and other competitively sensitive matters.

50.    Selvig resigned on or about November 24, 2025, and separated from Fortegra effective December 13, 2025. During his exit interview, which was conducted on December 15, 2025, Selvig informed the Company that he was joining a start-up but did not name the entity. However, Fortegra now knows that Selvig was joining a start-up that he helped establish on the back of stolen, Fortegra-derived information.

51.    On July 22, 2025, or more than four months before tendering his resignation, Selvig sent an email to himself containing a drafted professional biography reflecting his departure from Fortegra to join Pinion as its U.S. Chief Underwriting Officer. At the time of this email, Pinion Insurance had not yet been formally launched.

52.    The timing and substance of this communication demonstrates that Selvig had already agreed to join Pinion and was actively assisting in the development of Pinion's U.S. operations while still employed by Fortegra. This was not mere future employment planning. It was active participation in the development of a direct competitor using Fortegra's business model and trade secret information.

53.    Upon information and belief, Selvig worked in coordination with Vaag, Baird, and others involved in Project Clover to help design Pinion's underwriting strategy, organizational structure, and MGA engagement model while still employed by Fortegra.

54.    Upon information and belief, Selvig has continued to use Fortegra's confidential and trade secret information in his role at Pinion, including in connection with outreach to and discussions with Fortegra's existing MGA partners.

55.     On February 19, 2026, approximately two (2) months after his departure from Fortegra, Selvig was announced as Pinion's U.S. Chief Underwriting Officer, where he is responsible for building Pinion's U.S. MGA network and helping lead its U.S. underwriting operations.

56.     For example, on April 6, 2026, a representative of Aegis, one of Fortegra's largest MGA relationships, sent a calendar invitation to Selvig and Vaag for "[c]ontinuation of Aegis/Pinion program review/launch." Selvig was the Fortegra underwriter responsible for the Aegis program, about which Fortegra maintains specific, non-public intelligence. That information was among the materials Vaag transferred off Fortegra's systems while still employed, including in close proximity to Selvig's separation. The April 6, 2026, invitation was inadvertently sent to Vaag's Fortegra email account, revealing that Defendants were actively engaging with a core Fortegra program partner in connection with Pinion's competing platform. In this context, the subject matter and timing of the communication confirms that Defendants are leveraging Fortegra-derived confidential information and trade secrets regarding relationships to target Fortegra's existing partners.

57.     Upon information and belief, this outreach is not limited to Aegis. Consistent with Selvig's role in building Pinion's MGA network, Defendants have engaged, and continue to engage, other MGAs and business partners of Fortegra in connection with the development of Pinion's competing platform.

58.     The April 6, 2026, communication provides evidence that Defendants are using Fortegra-derived trade secrets and confidential information to solicit and

20

develop business with Fortegra's existing partners. That conduct poses an immediate and ongoing threat to Fortegra's relationships and competitive position that cannot be remedied through monetary damages alone.

59.    Upon information and belief, Vaag provided confidential information about Selvig to Pinion, including information about his duties, knowledge, compensation, and performance, and assisted Pinion in soliciting Selvig to leave Fortegra and join Pinion. In addition, Selvig independently possessed and used Fortegra's confidential information, including underwriting strategies, program data, and MGA relationships, in furtherance of Pinion's development.

60.    Upon information and belief, Defendants have used, and intend to continue using, Fortegra's confidential information and trade secrets concerning personnel roles, compensation, performance, and organizational structure to identify and solicit additional Fortegra employees for employment with Pinion.

**D.    The Pinion Risk Consulting Relationship Gave Baird and Pinion Access to Fortegra's Proprietary Information**

61.    Before the events giving rise to this action, Fortegra, through its affiliate LOTSolutions, entered into the Client Agreement with Pinion Risk Consulting Limited, an entity founded and led by Baird. Under that Agreement, Pinion Risk was engaged from February 8, 2023, to September 1, 2025, to provide actuarial and analytical services in support of Fortegra's business in the United Kingdom.

62.    The consulting relationship gave Pinion Risk and Baird access to highly sensitive Fortegra information for expressly limited purposes. That information

21

included underwriting and claims data, business plans and forecasts, MGA program information, underwriting rules and guidelines, reinsurance structures and strategies, loss triangles and development curves, CAT exposures and modeling strategies, large loss reports, MGA reconciliations and program oversight processes, profit models, loss picks and pricing strategies, rating models, pricing models, actuarial workflows and processes, reserving policies, MGA program results and profitability, segment results for Fortegra's Specialty division, risk scoring and benchmarking, MGA audits, BCAR modeling, returns by MGA program, and related forecasts.

63. The Client Agreement imposed clear confidentiality restrictions. Pinion Risk was prohibited from disclosing Fortegra's confidential information to third parties and from using it for any purpose other than the limited purposes for which it was provided to benefit Fortegra. Those duties survived termination of the Agreement, and Fortegra retained ownership of its proprietary materials, methodologies, processes, and analytical frameworks. The Client Agreement also required immediate disclosure of any conflict of interest or potential conflict of interest.

64. In other words, Baird and the Pinion enterprise were not strangers to Fortegra's business. They had already been entrusted, by contract, with access to Fortegra's proprietary strategies, analytical frameworks, and operational information. That access made the later misconduct all the more serious. It also makes plain that Baird and Pinion knew exactly what Fortegra information was confidential, why it was valuable, and that it could not lawfully be used to build a competing platform.

65.     Vaag was responsible for managing Fortegra's relationship with Pinion Risk under the Client Agreement.

**E.      Vaag Shares Trade Secrets at the Same Time He Was Supposed to Wind Down the Client Relationship, Not Help Build a Competitor**

66.     By mid-June 2025, while still employed by Fortegra, Vaag and Selvig were already participating in detailed planning for the launch of a competing U.S. insurance platform. In particular, Fortegra has identified an email sent by Vaag to his personal email account on June 13, 2025, with the subject line "USA Launch," attaching a document titled "Questions USA launch operations and UW_06 13 2025.docx." The document reflects a detailed, structured plan for launching a specialty insurance operation in the United States, including regulatory strategy, licensing pathways, staffing and operational buildout, underwriting and claims infrastructure, and approaches for engaging MGA partners. In substance, the document reflects a comprehensive operational blueprint for building a U.S.-based insurance platform.

67.     The document contemplates specific roles, responsibilities, and operational decisions necessary to start up Pinion's U.S. business and aligns with the capabilities Pinion later publicly represented it would deploy at launch. It also includes a statement that "Kyle and [Joel] are available to travel any time, anywhere as necessary." The document thus confirms that Selvig was actively involved in, and committed to, the development of this competing platform while still employed by Fortegra. Metadata associated with the document identifies Neil McConachie, a co-

founder of Pinion and its Group Chief Executive Officer, as the document's author, confirming that Pinion's senior leadership was directly involved in this planning effort.

68. On June 18, 2025, Vaag, on behalf of Fortegra, was to provide notice of Fortegra's intent to terminate the Client Agreement with Pinion Risk.

69. Within days, Vaag started forwarding highly sensitive Fortegra information to his personal email account.

70. The timing is telling. At the precise moment when the Pinion consulting relationship should have been winding down and the parties' confidentiality obligations should have been top of mind, Vaag was extracting Fortegra's most valuable information from secure channels and moving it into his personal possession.

71. The forwarding activity that followed was not random. It was patterned, escalating, and highly revealing. It tracked the very categories of information that a new insurance platform would need in order to replicate Fortegra's business, establish underwriting and pricing discipline, structure its reinsurance, prepare rating-agency submissions, recruit the right personnel, evaluate opportunities, and launch a functioning MGA-focused insurance enterprise in the United States.

72. Vaag's forwarding of Fortegra's confidential information to personal email accounts and devices created a substantial risk that Fortegra's information has been further disseminated, retained outside Fortegra's control, or deleted in an effort to conceal misconduct. Absent immediate forensic inspection and preservation measures, there is a significant risk that relevant evidence will be lost or destroyed.

24

73. During this same period, Baird and others affiliated with Pinion, including Philip Vandoninck, Pinion's Group Chief Underwriting Officer, were working to launch Pinion Insurance in the United States under the internal project name "Project Clover."

74. While still employed as Fortegra's EVP and Chief Actuary, Vaag was working with Baird and others to steal and use Fortegra's proprietary information for that effort. Selvig likewise participated in that effort, including by preparing to assume a leadership role at Pinion and contributing to the development of its underwriting and program strategy while still employed by Fortegra.

75. Vaag acquired Fortegra's trade secrets through improper means, including by exceeding authorized access, violating Fortegra's written policies and contractual obligations, and transmitting protected information to personal accounts and devices for use outside Fortegra's secure systems. Defendants knew or had reason to know that the information was acquired through improper means and under circumstances giving rise to a duty to maintain its secrecy.

**F. June 24, 2025: Vaag Forwards Fortegra's Core Operating Playbook**

76. On June 24, 2025, only days after he was scheduled to deliver the termination notice to Pinion Risk, Vaag forwarded to his personal email multiple files reflecting Fortegra's internal processes and procedures for evaluating new business and MGA partnerships, as well as its existing departmental processes for underwriting, pricing, and related operational functions.

77. Those files included "New Business DD & Onboarding Process.pdf," "US Specialty Due Diligence Checklist.xlsx," "Insurance - Program Management Overview.pptx," and "Departmental Processes_YE 2024.pptx."

78. These were not innocuous reference materials. They were internal process documents that collectively revealed how Fortegra sources, diligences, evaluates, onboards, and manages business opportunities, including in the specialty and MGA context. Documents of that kind provide a competitor with a ready-made map of Fortegra's business processes, workflows, decision gates, and operating standards.

79. That same day, Vaag also forwarded "Departmental Information Flow.pdf," a deck generally describing Fortegra's business and how information flows through its insurance and reinsurance operations. This information would be particularly useful to a startup attempting to replicate Fortegra's functional architecture because it identifies how departments interact, how decisions are routed, and how information moves through the enterprise.

80. Fortegra has compiled a representative summary of the files and emails Defendant Vaag forwarded to his personal email account beginning from June 2025, including the file names, descriptions of their contents, and the nature of the information reflected in those materials, a true and correct copy of which is attached hereto as Exhibit D.

81.   In short, by the beginning of the Summer of 2025, Vaag had already begun stripping Fortegra's internal operating playbook from its secure environment and moving it to his personal email.

**G.   July 2025: Vaag Delays Termination, Then Starts Building Pinion in Earnest**

82.   Although Vaag was to notify Pinion Risk that the consulting relationship would be ending, the formal notice to Baird was not sent until July 4, 2025, and even then it gave an effective termination date of September 1, 2025. Rather than an immediate and clean cessation of the relationship, the termination was extended, providing additional time during which Baird, Pinion Risk, and Vaag remained intertwined.

83.   By July 23, 2025, the scheme had plainly moved far beyond misuse of internal process documents. On that date, Vaag forwarded to himself five spreadsheets under the subject line "BCAR." These files were models spanning 2026 through 2031 and were associated with "Project Clover."

84.   The files were saved under names reflecting year-end model periods for 2026 through 2031 and were models Pinion apparently intended to submit to AM Best, a credit rating agency specializing in the insurance industry, as part of its efforts to obtain a rating.

85.   BCAR, or Best's Capital Adequacy Relativity, is central to AM Best's evaluation of an insurer's financial strength and capital adequacy. A new insurer seeking credibility in the market must present comprehensive forward-looking

27

financial projections and a coherent business plan to the rating agency. Pinion's use of BCAR-related modeling therefore reflects serious operational planning for launch, not abstract brainstorming.

86. There was no legitimate Fortegra business reason for Vaag to forward these BCAR-related Project Clover files to his personal email in July 2025. The only plausible explanation is the obvious one: Vaag was using Fortegra knowledge and resources while still a Fortegra executive to help Pinion build its launch-ready financial and rating-agency framework.

87. The next day, on July 24, 2025, Vaag forwarded to himself a written job description for the "Chief Claims Officer" position at Pinion Insurance.

88. Again, there was no legitimate Fortegra business reason for Vaag, while still serving as Fortegra's EVP and Chief Actuary, to email himself an internal job description for a senior leadership role at Pinion Insurance. The timing strongly suggests that Vaag was not merely aware of Pinion's development. He was involved in helping build its senior leadership structure and operational team while still owing Fortegra fiduciary duties.

89. On July 25, 2025, Vaag forwarded to himself "Financial model USA_05 21 2025.xlsb," a spreadsheet modeling the launch of Pinion Insurance in the United States from 2026 through 2031.

90. The spreadsheet was not generic. It included a 2026 column headed "LAUNCH US," projected salaries for a U.S.-based CEO and U.S.-based CUO, and financial projections spanning multiple years. That document is direct evidence that,

28

while employed by Fortegra, Vaag was actively helping build the financial and leadership structure of Pinion's U.S. launch.

91.    The significance of that document only grew clearer later when, on February 19, 2026, Pinion publicly announced that Selvig, formerly Fortegra's VP of Commercial Underwriting, would serve as Pinion's U.S. Chief Underwriting Officer. The July 25 model's projected U.S. CUO role was not hypothetical at all. It was part of a plan already taking shape while Vaag and Selvig remained at Fortegra. Selvig's prior July 22, 2025, email drafting his executive biography for Pinion confirms that his transition to Pinion was not opportunistic or post hoc, but rather part of a coordinated plan developed months earlier while he remained at Fortegra.

92.    On July 26, 2025, Vaag emailed Baird asking her to send him a Microsoft Teams link for a 5:00 p.m. meeting because he was having cell phone issues. On July 30, 2025, he emailed Baird again proposing another meeting at 4:00 p.m. These were contemporaneous communications during the period in which Vaag was forwarding Pinion launch materials and Project Clover files to himself.

93.    Those July communications corroborate that Baird was not an uninformed bystander. She was communicating directly with Vaag as he was extracting Fortegra information and working on Pinion Insurance launch planning.

**H.    August 2025: Project Clover Moves into Underwriting Structure and Deal Work**

94.    On August 20, 2025, Vaag forwarded "US Due Diligence of New Opportunities.pptx." Although the file contents were not accessible in Fortegra's

review, the file name and context confirm that it aligns with (and almost certainly relates to) the needs of a new insurer attempting to create a U.S. diligence and business-selection framework.

95. On August 30, 2025, Vaag forwarded to his personal email "Clover - Line size grid.xlsb."

96. The body of that email removes any real doubt about what was happening. Vaag wrote: "Please find attached my suggested line size guides for Pinion in US (Clover is the project name FYI). The line sizes are net of reinsurance. Please let me know if need any tweaking and please also let me know if any of the BCAR classes are incorrectly allocated. BCAR classes is not my strong suit!"

97. That August 30 email shows, in Vaag's own words, that he was preparing "suggested line size guides" for "Pinion in US," confirms that "Clover" was the project name (and that the entire scheme was coordinated to such a degree that the group gave it a name), references the interaction between underwriting line sizes and reinsurance, and ties the work back to BCAR classifications. It is impossible to reconcile that email with Vaag's fiduciary obligations to Fortegra.

98. Metadata associated with the "Clover - Line size grid.xlsb" file further underscores the coordinated nature of the scheme. The file properties identify Laura Baird as the author and Philip Vandoninck as the last person to modify the file shortly before Vaag emailed it to himself. That evidence supports the inference that Baird and Vandoninck were actively working with Vaag on Pinion's U.S. underwriting structure.

**I.    September 2025: Vaag Forwards Fortegra Reinsurance and Strategic Program Materials While Continuing Contact with Baird**

99.    On September 4, 2025, Vaag forwarded to himself several highly sensitive Fortegra materials relating to an existing reinsurance arrangement involving Accelerant, including: "Accelerate CORE QS 2023 Slip - Fortegra - FULLY EXECUTED.pdf," "Accelerant Inuring Reinsurance 2023.pdf," "Accelerant Full Deck 2023 Renewal Submission.pdf," and "Accelrate 2023 Submission--Actuarial Supplement_vF6.xlsb."

100.    Those materials were critically sensitive. They reflected, among other things, Fortegra's ceding commission terms, underwriting appetite and risk strategy, reinsurance panel composition, rate history, historical losses associated with products, and actuarial information concerning the structure and economics of the relationship.

101.    A competitor armed with those materials would gain visibility into Fortegra's reinsurance architecture, risk appetite, product economics, and strategic relationships in the market. That is precisely the type of information a new market entrant would covet if it wanted to shortcut years of relationship-building and analytical work.

102.    On September 22, 2025, Vaag emailed Baird requesting dinner on September 24. By then, the consulting relationship had been terminated, yet the personal and professional contact continued. Indeed, the September dinner meeting confirms that Vaag and Baird remained in ongoing communication while Pinion's development proceeded.

31

**J.     October 2025: Vaag Uses Fortegra Resources While Working on Pinion Models and Targeting Personnel**

103.   In October 2025, the forwarding activity and Pinion-related work became even more explicit.

104.   On October 1, 2025, Vaag forwarded to himself "G-C-N combined Ratio Diagnostic.xlsx," a spreadsheet created by Stephen Yaros, Fortegra's Director of Specialty Underwriting, on December 4, 2024, and later modified by Vaag on October 1, 2025.

105.   A combined ratio diagnostic is a fundamental underwriting-performance tool. It assesses the sustainability and risk of an insurance portfolio by analyzing underwriting results and whether the business is generating underwriting profit or loss. Vaag's use of a Fortegra-created combined ratio tool while simultaneously building Pinion supports the inference that he was using Fortegra's resources and methodologies for Pinion's benefit.

106.   On October 14, 2025, Vaag forwarded "Loss ratio and commission terms update_131025.xlsx," a spreadsheet showing Pinion's planned loss ratio and commission terms. One column refers expressly to the "Pinion Plan."

107.   Metadata in the form of file properties indicates the spreadsheet was created and last modified by Philip Vandoninck. Vandoninck, Pinion's co-founder and Group Chief Underwriting Officer, was directly involved in the same planning materials Vaag was handling while still a Fortegra executive.

32

108. Also on October 14, 2025, Vaag forwarded an email with material in the body referring to the "Pinion Plan," which appears to reflect his active work on Pinion risk modeling or strategic planning.

109. On October 26, 2025, Vaag forwarded "Specialty Loss Ratio Summ by Program 202509.xlsb," along with another file, to his personal email.

110. The "Specialty Loss Ratio Summ by Program 202509.xlsb" spreadsheet was extraordinarily sensitive. The spreadsheet details losses and performance summaries for all existing specialty insurance programs, identifies the associated underwriter for each program, and reflects detailed financial metrics and performance indicators at the MGA/program level.

111. This is precisely the sort of internal portfolio-level intelligence that a competitor would use to identify Fortegra's strongest and weakest programs, understand which underwriters are associated with them, evaluate where to target business, and replicate or attack Fortegra's strategy.

112. On October 30, 2025, Vaag sent himself an email with the subject line "Relationships." In the body of the email, he listed a series of roles and titles: CEO; SVP & CUO; AVP & Mid Level UW; VP & UW; Due Diligence Lead; Accountant; VP & US Claims Lead; Claims Operations Lead; and VP & Actuary Lead.

113. The list reads like a staffing plan for a new insurer, not a legitimate Fortegra business communication. Fortegra now understands that one of the entries, "VP & UW," referred to Kyle Selvig, who was then Fortegra's VP of Commercial Underwriting and who later departed to join Pinion. The list supports the inference

33

that Vaag was mapping out the positions and likely personnel needed to stand up Pinion's U.S. platform and, at minimum, was considering or facilitating recruitment of Fortegra personnel for those roles.

**K.    November and December 2025: Vaag Continues Harvesting Fortegra's Due Diligence and Program-Performance Intelligence**

114.    In late November 2025, Vaag forwarded to himself multiple files reflecting Fortegra's processes and procedures for evaluating new MGA opportunities and specific diligence materials relating to deals Fortegra had recently evaluated.

115.    On November 23, 2025, Vaag forwarded: "Premium Exposure and Loss Data SUS 11.06 - Fortegra Work.xlsx," "PRICING TEMPLATE Loss Ratio Analysis AmRisc with Rate Change.xlsb," and "PRICING TMEMPLATE Loss Ratio Analysis AmRisc.pdf."

116.    These materials were highly sensitive because they showed not just a generic process, but actual Fortegra deal work. They reflected how Fortegra analyzed premium exposure, loss data, rate changes, and pricing in evaluating specific business opportunities. Such materials give a competitor immediate insight into Fortegra's diligence templates, assumptions, thresholds, and pricing analysis.

117.    On December 15, 2025, Vaag forwarded to himself "Specialty Loss Ratio Summ by Program 2025 10_Range Valued.xlsb," a spreadsheet updating carrier and MGA performance, booked losses, and ALAE experience as of October 31, 2025.

118.    ALAE, or allocated loss adjustment expense, is a core part of claims and profitability analysis. The December 15 spreadsheet therefore provided an updated

34

internal view into Fortegra's program-level performance, booked losses, and claims-related expense experience across carriers and MGAs.

119.    By forwarding the October 26 and December 15 program-performance spreadsheets, Vaag did more than take stale historical information. He took current and updated intelligence about the actual performance of Fortegra's book. That information would be immensely valuable to a competitor trying to identify where Fortegra makes money, where it faces pressure, which niches are attractive, and where targeted recruitment or solicitation efforts might be most effective.

120.    Upon information and belief, some or all of the Fortegra documents described above that Vaag forwarded to his personal email address were shared with the Defendant Pinion entities and Baird.  The Defendant Pinion entities and Baird were aware that the documents contained Fortegra's confidential information and trade secrets and that Vaag did not have permission or a Fortegra business need to share them with them.  The Defendant Pinion entities and Baird were aware that Vaag was breaching his duty of loyalty and fiduciary duty to Fortegra by sharing the documents and information.

## L.    Vaag Was Separately Bound By Project-Specific Confidentiality Restrictions for the DB Insurance Acquisition

121.    In or around Fall 2024, DB Insurance Co., Ltd.'s ("DB Insurance") began acquisition discussions with Fortegra.  DB Insurance's acquisition of Fortegra was a cash transaction that was not publicly announced until September 2025 and valued at approximately $1.65 billion.  This acquisition effort was known withing DB

35

Insurance and Fortegra as "Project Eagle." Separate and apart from Fortegra's standing confidentiality, information security, and business-conduct policies, Vaag was required to execute a project-specific confidentiality policy and security procedures agreement in connection with "Project Eagle." Vaag signed that agreement on November 18, 2024 (the "Project Eagle Confidentiality Agreement").

122. Under the Project Eagle Confidentiality Agreement, Vaag agreed that all non-public information concerning the project was to be kept in the strictest confidence at all times; that disclosure of the existence or nature of the project could be highly disruptive to Fortegra; that disclosure was permitted only to specifically authorized persons; that project information could not be left where it might be accessible to unauthorized persons; that care had to be used in email, instant message, and voicemail communications; and that unauthorized disclosures had to be reported immediately. Vaag further acknowledged that money damages might be inadequate for breach and that Fortegra would be entitled to seek specific performance and injunctive and other equitable relief for any breach or threatened breach.

**M.  January 2026: Vaag Takes Deal-Sensitive Acquisition Materials and Internal Process Information Even as Pinion Nears Launch**

123. The forwarding activity did not stop with underwriting, pricing, and MGA program materials. In January 2026, Vaag forwarded numerous files containing confidential information related to DB Insurance's pending acquisition of Fortegra.

124. Specifically, on January 4, 2026, Vaag forwarded "Dove JAX Presentation (June 2025).pdf," "Dove Jacksonville Meeting

36

Agenda_v5.31_(12.30).pdf," and "Project Eagle - Dove Questions for Jacksonville Week of June 2.pdf."

125. These documents related to confidential meetings and workstreams concerning DB Insurance's pending acquisition of Fortegra and were subject not only to Fortegra's ordinary confidentiality and information-security controls, but also to the heightened project-specific restrictions Vaag had expressly agreed to follow for Project Eagle.

126. On January 21, 2026, Vaag forwarded "Fortegra Specialty Due Diligence Checklist - 8.21.2023.xlsx," a spreadsheet detailing Fortegra's method and process for evaluating MGA opportunities and risk through multiple levels of review.

127. By January 2026, Vaag was still harvesting Fortegra's process-level playbooks, organizational information, diligence procedures, and transaction-sensitive materials, even as Pinion was on the verge of formal launch.

128. Upon information and belief, Vaag shared the Fortegra acquisition information with Defendant Pinion entities and Baird, who were aware of the confidential nature of the information and that it was a breach of Vaag's duties of loyalty to Fortegra to share the information.

**N. Vaag's Forwarding Activity Tracks Pinion's Launch and Supports the Inference of Ongoing Use**

129. Though Fortegra's investigation is ongoing, Vaag's forwarding activity appears to have stopped only at the end of January 2026.

130. That timing is itself telling. Pinion publicly announced its launch on February 17, 2026, describing itself as a newly formed specialty insurance carrier built on the foundations of Pinion Risk Consulting, and confirming it was seeking a rating from AM Best.

131. Two days later, on February 19, 2026, Pinion announced Selvig as its U.S. Chief Underwriting Officer and stated that he would be responsible for building Pinion's U.S. MGA network, with first U.S. business expected to bind in the second quarter of 2026.

132. On March 19, 2026, Vaag gave Fortegra notice of his own departure and, at his request, Fortegra extended his separation date to April 3, 2026, so he could maintain healthcare coverage through the end of April. Fortegra now knows that, by that point, Vaag had spent months using his position to assist a competing enterprise built on Fortegra's proprietary foundation.

133. The chronology supports a straightforward and compelling inference: Vaag harvested Fortegra's internal processes, actuarial methods, underwriting and reinsurance strategies, profitability data, organizational intelligence, and transaction-sensitive materials during the exact period in which Pinion was being built for launch. The forwarding apparently stopped, not because the misconduct was innocent, but because by early 2026 the Pinion start-up buildout was effectively complete and the formal public launch was imminent.

134. Taken together, the materials Vaag misappropriated constitute a comprehensive blueprint of Fortegra's business, including how it evaluates

opportunities, prices risk, structures reinsurance, allocates capacity, manages programs, and builds its organizational infrastructure. Defendants did not take isolated documents. They took the playbook.

## O.    Baird and Pinion Knew What Vaag Was Doing and Benefited From It

135.    Baird cannot credibly claim ignorance. She was the signatory to the Client Agreement and leader of Pinion Risk, the entity through which Fortegra had already entrusted sensitive information to the Pinion enterprise. She therefore knew the nature, confidentiality, and value of Fortegra's information and the contractual restrictions governing it.

136.    Baird was also in direct communication with Vaag during the core period of the misappropriation. Their July 26 and July 30 communications, the August 25 loss-pick exchange, and the September 22 dinner request all show continued contact while Vaag was forwarding Project Clover materials, underwriting frameworks, and Fortegra trade secrets to himself, and while Pinion's executive leadership was actively engaged in planning its U.S. operations.

137.    The "Clover - Line size grid.xlsb" metadata tying the file to Baird and Vandoninck further supports that Pinion leadership was participating directly in the work product Vaag was moving through his personal email account.

138.    Pinion also plainly benefitted from the misconduct.

139.    The materials Vaag misappropriated provided Pinion with a ready-made foundation to launch its operations, including underwriting frameworks, financial models, and insight into Fortegra's business relationships and program performance.

These are exactly the types of information a startup insurer would need to enter the market quickly, seek a rating from AM Best, build underwriting and claims leadership, structure reinsurance, assess opportunities, recruit personnel, and target Fortegra's MGA-focused business.

140.    Pinion's acceptance and use of the benefits of Vaag's misconduct also supports Fortegra's claim that Pinion aided and abetted Vaag's breaches, knowingly accepted misappropriated information, and intentionally interfered with Vaag's duties and contractual obligations to Fortegra.

**P.    Defendants' Conduct Has Caused and Threatens Immediate, Irreparable Harm**

141.    Defendants' conduct has caused Fortegra immediate and irreparable harm and threatens continued harm absent injunctive relief.

142.    Once trade secrets are removed from secure systems, transmitted to personal email accounts, and integrated into a competitor's buildout efforts, the injury cannot be fully repaired through money damages alone. Fortegra has lost control over the confidentiality of some of its most sensitive information.

143.    Vaag's own written agreements and policy acknowledgments recognized the sensitivity of the information he was entrusted to handle and, in the case of Project Eagle, expressly acknowledged that monetary damages might not be a sufficient remedy and that Fortegra would be entitled to specific performance and injunctive relief for breach or threatened breach. That express acknowledgment further confirms the appropriateness of immediate equitable relief here.

40

144.   Defendants' conduct has given Pinion, a direct competitor, a substantial and unlawful head start. Instead of independently building underwriting guidelines, pricing approaches, BCAR-related rating materials, MGA diligence frameworks, claims and reserve processes, reinsurance structures, and organizational plans, Defendants used Fortegra's work product and internal intelligence as a shortcut.

145.   Defendants' misappropriation has provided Pinion with a substantial head start advantage, allowing it to bypass years of development, avoid significant costs, and accelerate its market entry using Fortegra's proprietary information.

146.   Defendants' possession and use of Fortegra's information also create a serious and continuing risk that Pinion will use Fortegra's trade secrets to solicit Fortegra employees, target Fortegra's MGA and distribution partners and related programs, identify profitable niches, avoid mistakes Fortegra has already absorbed the cost of learning, and target Fortegra's existing partners with informed, tailored proposals.

147.   That risk is not hypothetical. The materials at issue include not only general business concepts, but concrete program-level financial metrics, current portfolio performance, internal process documents, staffing intelligence, and Pinion launch materials explicitly tied to "Project Clover," BCAR, U.S. line sizes, and the "Pinion Plan," as well as Defendants' ongoing engagement with Fortegra's program partners.

148.   Absent judicial intervention, Defendants will continue to possess, use, disclose, and benefit from Fortegra's trade secrets and confidential information, and

41

Fortegra will continue to suffer harm in the form of lost competitive advantage, diminished control over its proprietary information, threatened employee raiding, threatened interference with business relationships, and unfair competition by a rival whose U.S. platform was built, at least in material part, on Fortegra's confidential foundation, and is now being deployed to compete directly for Fortegra's existing business relationships.

## CLAIMS FOR RELIEF

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS
### Defend Trade Secrets Act, 18. U.S.C. § 1836
### (Against All Defendants)

149. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 148 as if fully set forth herein.

150. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), provides a cause of action for misappropriation of trade secrets "related to a product or service used in, or intended for use in, interstate or foreign commerce."

151. During their employment with Fortegra, Defendants Vaag and Selvig were given access to Fortegra's confidential and proprietary business information, including, but not limited to, underwriting methodologies, actuarial models, and pricing strategies; reinsurance structures and placement strategies; internal diligence processes, business planning, and operational methodologies; strategic and non-public analyses of its insurance and reinsurance business; and information regarding the roles, responsibilities, and capabilities of key employees.

152. This information constitutes trade secrets under the DTSA because it derives independent economic value from not being generally known to, or readily ascertainable by, others who could obtain economic value from its disclosure or use and is the subject of reasonable efforts to maintain its secrecy, including internal policies restricting access, confidentiality designations, and employee confidentiality agreements. 18 U.S.C. § 1839(3).

153. Fortegra takes reasonable measures to protect the secrecy of its trade secrets, including limiting access to authorized personnel, requiring acknowledgment of information security policies, and enforcing confidentiality obligations.

154. Defendant Vaag, through his employment and engagement with Fortegra, acquired, had access to, and had direct knowledge of, Fortegra's trade secrets as described above, and was contractually and legally obligated to maintain their confidentiality and refrain from using or disclosing them for purposes outside his Fortegra duties.

155. Defendant Selvig, through his employment and engagement with Fortegra, likewise acquired, had access to, and had direct knowledge of Fortegra's trade secrets and confidential information, and was subject to fiduciary, contractual, and policy-based obligations to maintain their confidentiality and refrain from using or disclosing them outside the scope of his Fortegra duties.

156. Defendant Vaag improperly transmitted Fortegra trade secrets to his personal email account and used them for purposes unrelated to his work for Fortegra,

43

including in connection with his work on behalf of and anticipated employment with Pinion.

157.    Upon information and belief, Selvig improperly transmitted, retained, and/or used Fortegra trade secrets outside of Fortegra's secure systems and for purposes unrelated to his work for Fortegra, including in connection with his work on behalf of and subsequent employment with Pinion.

158.    Pinion, through Defendants Vaag and Selvig and its prior engagement with Fortegra, knowingly acquired and used Fortegra's trade secrets, despite knowing or having reason to know that such information was subject to confidentiality obligations and had been obtained through improper means.

159.    In doing the acts complained of herein, Defendants have used and will continue to use Fortegra's trade secrets without a privilege to do so, including in connection with ongoing efforts to develop and launch Pinion's competing business. Defendants' conduct therefore qualifies as misappropriation under 18 U.S.C. § 1839(5), giving rise to the remedies described in 18 U.S.C. § 1836(b)(3).

160.    As a result of the above conduct, Fortegra is entitled to injunctive relief, including entry of a temporary restraining order, prohibiting Defendants' continued possession, use, or disclosure of Fortegra's trade secrets, and to recover any compensatory damages in an amount to be proven at trial.

## COUNT II– MISAPPROPRIATION OF TRADE SECRETS
### Florida Uniform Trade Secrets Act
### (Against All Defendants)

161.   Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 160 as if fully set forth herein.

162.   The Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001–688.009, provides a cause of action for the misappropriation of trade secrets.

163.   During their employment with Fortegra, Defendants Vaag and Selvig were given access to Fortegra's confidential and proprietary business information, including, but not limited to, underwriting methodologies, actuarial models, and pricing strategies; reinsurance structures and placement strategies; internal diligence processes, business planning, and operational methodologies; strategic and non-public analyses of its insurance and reinsurance business;  and information regarding the roles, responsibilities, and capabilities of key employees.

164.   This information constitutes trade secrets under the FUTSA because it derives independent economic value from not being generally known to, or readily ascertainable by, others who could obtain economic value from its disclosure or use and is the subject of reasonable efforts to maintain its secrecy, including internal policies restricting access, confidentiality designations, and employee confidentiality agreements.  Fla. Stat. § 688.002(4).

165.   Fortegra takes reasonable measures to protect the secrecy of its trade secrets, including limiting access to authorized personnel, requiring acknowledgment of information security policies, and enforcing confidentiality obligations.

166. Defendants Vaag and Selvig, through their employment and engagement with Fortegra, acquired, had access to, and had direct knowledge of, Fortegra's trade secrets as described above, and were contractually and legally obligated to maintain their confidentiality and refrain from using or disclosing them for purposes outside their Fortegra duties.

167. Defendant Vaag improperly transmitted Fortegra trade secrets to his personal email account and used them for purposes unrelated to his work for Fortegra, including in connection with his work on behalf of and anticipated employment with Pinion.

168. Upon information and belief, Defendant Selvig improperly transmitted, retained, and/or used Fortegra trade secrets outside Fortegra's systems and for purposes unrelated to his Fortegra duties, including in connection with his work on behalf of and subsequent employment with Pinion.

169. Pinion, through Defendants Vaag and Selvig and its prior engagement with Fortegra, knowingly acquired and used Fortegra's trade secrets, despite knowing or having reason to know that such information was subject to confidentiality obligations and had been obtained through improper means.

170. In doing the acts complained of herein, Defendants have used and will continue to use Fortegra's trade secrets without a privilege to do so, including in connection with ongoing efforts to develop and launch Pinion's competing business. Defendants' conduct therefore qualifies as misappropriation under Fla. Stat. § 688.002(2), giving rise to the remedies provided in Fla. Stat. § 688.003–688.004.

171. As a result of the above conduct, Fortegra is entitled to injunctive relief, including entry of a temporary restraining order, prohibiting Defendants' continued possession, use, or disclosure of Fortegra's trade secrets, and to recover any compensatory damages in an amount to be proven at trial.

**COUNT III – BREACH OF CONTRACT (Confidentiality)**
**(Against Vaag and Selvig)**

172. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 171 as if fully set forth herein.

173. Defendants Vaag and Selvig signed and agreed to abide by certain confidentiality obligations in Fortegra's Code of Business Conduct and Ethics and Information Security Policy, which included a non-disclosure agreement. According to the non-disclosure agreement, Defendants Vaag and Selvig agreed not to "disclose or divulge to others, including future associates, any trade secrets, confidential information, sensitive information or any other proprietary data of the Company in violation of this agreement." Ex. B at § 15.1.

174. In addition, Defendant Vaag entered into the Project Eagle Confidentiality Agreement, a separate, project-specific confidentiality agreement in connection with DB Insurance's proposed acquisition of Fortegra, pursuant to which he agreed to maintain in strict confidence all non-public information relating to that transaction, limit disclosure to authorized individuals, and refrain from any unauthorized use or dissemination of such information.

47

175. The aforementioned agreements are valid and enforceable and were all supported by valid consideration, namely, Defendants Vaag's and Selvig's employment, access to Fortegra's confidential information and trade secrets, and compensation.

176. Fortegra performed its obligations under the agreements by providing Defendants Vaag and Selvig with access to its confidential and proprietary information and also by retaining their employment.

177. Defendants Vaag and Selvig breached the non-disclosure agreement by improperly accessing, downloading, and disclosing vast amounts of confidential information regarding Fortegra's business and its employees, and other proprietary and restricted information.

178. Defendant Vaag separately and independently breached the Project Eagle Confidentiality Agreement by, among other things, accessing, transmitting, and retaining highly sensitive, non-public information concerning DB Insurance' acquisition of Fortegra for purposes unrelated to Fortegra's business and outside Fortegra's secure systems, in direct violation of the heightened confidentiality obligations.

179. Under the nondisclosure agreements, Defendants Vaag and Selvig agreed that Fortegra is entitled to seek injunctive relief for Defendant Vaag's breach.

180. As a result of Defendants Vaag and Selvig's breaches, Fortegra has suffered damages.

48

## COUNT IV – BREACH OF CONTRACT (Confidentiality)
### (Against Pinion)

181.    Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 180 as if fully set forth herein.

182.    On or about February 8, 2023, LOTSolutions entered into a written Client Agreement with Defendant Pinion Risk.

183.    The Client Agreement is a valid and enforceable contract supported by consideration, including LOTSolutions' payment of fees and provision of access to Fortegra's confidential and proprietary information, data, and business materials.

184.    In connection with the Client Agreement, Pinion Risk was granted access to highly sensitive, non-public, and proprietary information belonging to Fortegra, including underwriting data, actuarial models, reinsurance structures, financial projections, MGA program data, and other trade secret information.

185.    The Client Agreement expressly restricts Pinion Risk's use and disclosure of Fortegra's confidential information. Specifically, the Client Agreement provides that the receiving party shall "not disclose the Confidential Information of the Disclosing Party to any third party," shall "use all reasonable endeavours to protect the Confidential Information," and shall "only use the Confidential Information…for the purposes for which it was disclosed… and not for any other purpose." Ex. A at § 8.1.

186.    The Client Agreement further provides that the services and deliverables are provided solely for the defined "Purpose," and may not be used for any other purpose. Ex. A at § 6.2(g).

187.    The Client Agreement expressly contemplates injunctive relief, providing that monetary damages may be inadequate for a breach of confidentiality obligations and that the non-breaching party is entitled to seek injunctive or equitable relief. Ex. A at § 8.3.

188.    Plaintiffs fully performed their obligations under the Client Agreement, including by providing Pinion Risk with access to Fortegra's confidential and proprietary information and paying amounts due under the Agreement.

189.    Pinion Risk breached the Client Agreement by, among other things: (a) using Fortegra's confidential and proprietary information for purposes outside the limited "Purpose" defined in the Agreement; (b) disclosing or allowing access to Fortegra's confidential information to third parties, including Pinion and its affiliated entities; (c) failing to protect Fortegra's confidential information from unauthorized use and disclosure; and (d) using Fortegra's confidential information in connection with the development of a competing insurance platform.

190.    Pinion Risk's breaches were knowing, intentional, and undertaken in coordination with Defendants Vaag, Selvig, and Baird, as part of a broader scheme to misuse Fortegra's confidential information and trade secrets.

191. Pinion Risk's conduct directly violated the express contractual limitations on use and disclosure set forth in the Client Agreement, including Sections 6.2(g) and 8.1.

192. As a direct and proximate result of Pinion Risk's breaches, Plaintiffs have suffered and will continue to suffer substantial damages, including loss of control over confidential and proprietary information, loss of competitive advantage, and the risk of ongoing misuse of their trade secrets.

193. Pinion Risk's breaches have caused and will continue to cause irreparable harm to Plaintiffs, for which there is no adequate remedy at law.

194. Pursuant to the Client Agreement and applicable law, Plaintiffs are entitled to injunctive relief, including temporary, preliminary, and permanent injunctions prohibiting further use or disclosure of their confidential information.

195. Plaintiffs are further entitled to recover all damages caused by Pinion Risk's breaches, together with all other relief available at law or in equity.

### COUNT V – BREACH OF FIDUCIARY DUTY AND THE DUTY OF LOYALTY
### (Against Vaag and Selvig)

196. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 195 as if fully set forth herein.

197. As Executive Vice President and Chief Actuary Officer, Defendant Vaag owed Fortegra fiduciary duties, including the duties of loyalty, good faith, and full disclosure. Likewise, Defendant Selvig owed the same duties to Fortegra by virtue of his position as Vice President of Commercial Underwriting.

198. Defendants Vaag and Selvig continue to owe a duty of confidentiality to Fortegra to refrain from disclosing Fortegra's confidential information or misappropriating its trade secrets.

199. Defendant Vaag breached his fiduciary duties by misappropriating Fortegra's confidential and proprietary trade secrets, transmitting confidential and proprietary information to his personal email account, and using or disclosing this information to benefit himself and Pinion, including in connection with soliciting Fortegra employees and building Pinion's competing business.

200. Defendant Selvig breached his fiduciary duties by, among other things, misappropriating Fortegra's confidential and proprietary information, transmitting such information outside Fortegra's systems, and using or disclosing it to benefit himself and Pinion, including in connection with building Pinion's competing business and engaging with Fortegra's existing business partners.

201. Defendants Vaag's and Selvig's conduct was knowing, intentional, and without Fortegra's consent, and constituted a violation of Fortegra's Information Security Policy and Code of Business Conduct and Ethics.

202. As a direct and proximate result of Defendants Vaag's and Selvig's breaches of fiduciary duties and their duties of loyalty, Fortegra has suffered damages, including the loss of confidential information and competitive harm.

## COUNT VI – AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY
### (Against Pinion and Baird)

203.    Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 202 as if fully set forth herein.

204.    During their respective employment with Fortegra as Executive Vice President and Chief Actuary Officer and Vice President of Commercial Underwriting, Defendants Vaag and Selvig owed Fortegra fiduciary duties to refrain from disclosing Fortegra's confidential information, misappropriating Fortegra's trade secrets for a competitor's benefit, and soliciting Fortegra's employees for a competing business.

205.    Defendants Vaag and Selvig continue to owe a duty of confidentiality to Fortegra to refrain from disclosing Fortegra's confidential information or misappropriating its trade secrets.

206.    Defendants Vaag and Selvig breached their fiduciary duties to Fortegra by engaging in the conduct as described above.

207.    At all relevant times, Pinion and Defendant Baird were aware that Defendants Vaag and Selvig owed fiduciary duties to Fortegra.

208.    Pinion and Defendant Baird aided and abetted Defendants Vaag's and Selvig's breaches of their fiduciary duties to Fortegra by providing substantial encouragement of their wrongdoing.   Among other things, Pinion and Baird encouraged Defendant Vaag to perform work and disclose confidential information for Pinion while he was still employed by Fortegra as an Executive Vice President and Chief Actuary Officer, and while he was still receiving compensation from Fortegra.

Upon information and belief, Pinion and Baird also encouraged Defendant Selvig to perform work and disclose confidential information for Pinion while he was still employed by Fortegra as Vice President of Commercial Underwriting, and while he was still receiving compensation from Fortegra.

209.    Defendant Pinion's aiding and abetting Defendants Vaag's and Selvig's breaches of their fiduciary duties included direct involvement by Pinion's senior leadership, including Neil McConachie (Group Chief Executive Officer), Philip Vandoninck (Group Chief Underwriting Officer), and Defendant Baird (Group Chief Technology Officer), in planning and developing Pinion's U.S. operations while Vaag and Selvig remained employed by Fortegra and were providing access to Fortegra-derived information.

210.    As a direct and proximate result of Defendants Pinion's and Baird's actions, Fortegra has been harmed and has suffered damages, including the loss of confidential information and competitive harm.

211.    Therefore, Fortegra is entitled to recover monetary damages from Defendants Pinion and Baird as a result of their aiding and abetting Defendants Vaag's and Selvig's breaches of their fiduciary duties to Fortegra.

### COUNT VII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
**(Against Pinion)**

212.    Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 211 as if fully set forth herein.

213.   Fortegra maintained an ongoing business relationship with its senior executives and employees, including Defendants Vaag and Selvig, that included contractual, fiduciary, and confidentiality rights designed to protect Fortegra's confidential, proprietary, and trade secret information.

214.   Pinion was aware of the existence of Fortegra's business relationship with Defendants Vaag and Selvig, including their continuing obligations to Fortegra, through its prior dealings with Fortegra, the Client Agreement, and its direct interactions with Vaag and Selvig while they were still employed by Fortegra.

215.   Pinion interfered with Fortegra's relationships with its existing and prospective MGAs, program partners, reinsurance counterparties, and key employees, including Vaag and Selvig. Pinion's use of Fortegra's confidential information and trade secrets enabled it to identify, target, and solicit those relationships.

216.   Specifically, Pinion intentionally and without justification interfered with Fortegra's business relationships by: (1) encouraging and inducing Defendants Vaag and Selvig to breach their contractual and legal duties to Fortegra, including duties of confidentiality and loyalty; (2) accepting Fortegra's confidential, proprietary, and trade secret information from Defendants Vaag and Selvig, knowing such information was obtained and transmitted in violation of applicable law; (3) assisting Defendants Vaag's and Selvig's efforts to transition to Pinion, including recruiting or soliciting other Fortegra employees, while Defendants Vaag and Selvig were still employed at Fortegra and bound by restrictive covenants; and (4) utilizing Defendants Vaag and Selvig, while still employed by Fortegra and thereafter, to target and engage

55

Fortegra's business relationships, including, but not limited to, the relationship with Aegis, with whom Fortegra has ongoing and economically valuable relationships, using Fortegra's confidential information and trade secrets.

217.    Pinion's conduct was intentional, knowing, and not supported by any privilege.

218.    As a direct and proximate result of Pinion's actions, Fortegra has suffered and will continue to suffer damages, including, but not limited to, loss of confidential information and competitive harm.

219.    Therefore, Fortegra is entitled to recover monetary damages from Pinon as a result of its intentional interference with Fortegra's business relationship with Defendant Vaag.

## JURY DEMAND

220.    Plaintiffs hereby demand a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs The Fortegra Group, Inc., and LOTSolutions, Inc., respectfully pray for judgment in their favor against Defendants, as follows:

1.    Grant preliminary and permanent injunctive relief, including entry of a temporary restraining order that:

A. Requires the return and disgorgement of all Fortegra documents and information from Defendants' possession and restrains and enjoins Defendants from continuing to use any documents or information misappropriated from Plaintiffs;

56

B. Orders Defendants to preserve all documents, data, communications, or tangible things relating to Fortegra's trade secrets, confidential information, or Defendants' communications with one another or with third parties regarding such information;

C. Compels Defendants to produce all computers, cellular phones, USB drives, thumb drives, disks, external hard drives, or other electronic storage devices, accounts (including any cloud storage), or systems which Defendants have utilized or to which they had access at any time from January 2025 to the present (the "Electronic Media");

D. Compels Defendants to produce their Electronic Media to a computer forensics expert identified by Fortegra to conduct an appropriate search and forensic review of the Electronic Media;

E. Ordering that discovery immediately commence and be conducted on an expedited basis;

F. Requires Defendants to account for and return all Fortegra trade secrets and confidential information in their possession, custody, or control, and to certify, in writing, that they have returned to Fortegra all of Fortegra's trade secrets and confidential information in their possession, custody, or control;

G. Requires Defendants to provide an accounting of all revenues and profits derived from, facilitated by, or obtained by each of them, directly or indirectly, as a result of Defendants' misappropriation of Fortegra's trade secrets and confidential information;

H. Prohibits Defendants from soliciting, recruiting, inducing, or otherwise engaging any current or prospective Fortegra carriers, distributors, producers or MGAs through the use of Fortegra's confidential, proprietary, or trade secret information;

I. Prohibits Defendants from recruiting, hiring, or otherwise engaging Fortegra employees or contractors using Fortegra's confidential, proprietary, or trade secret information; and

J. Prohibits Pinion, Baird, and anyone acting on behalf of them, from causing, assisting, aiding, abetting, or inducing Vaag, Selvig or any other current or former Fortegra employee to engage in any of the conduct enjoined and restrained herein.

2. Grant Plaintiffs judgment against Defendants for actual damages in an amount to be shown at trial of this action.

3. Order Vaag and Selvig to disgorge and forfeit all compensation, bonuses, equity, and other remuneration paid to them during the period in which they breached their fiduciary duties to Fortegra, including all compensation earned while they were acting adversely to Fortegra's interests and in furtherance of a competing enterprise.

4. Assess exemplary damages, costs, and attorneys' fees against Defendants.

5. Award Plaintiffs punitive damages.

6. Award Plaintiffs pre-judgment and post-judgment interest on all damages proven at trial of this action.

7.     Award compensatory and consequential damages under the Defend Trade Secrets Act, including damages pursuant to 18 U.S.C. § 1836(b)(3)(B), and under the Florida Uniform Trade Secrets Act, including damages pursuant to Fla. Stat. § 688.004, in an amount to be determined at trial, plus all interest and costs permitted by law, for Defendants' misappropriation of Fortegra's trade secrets.

8.     Award exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount up to two times the damages awarded under 18 U.S.C. § 1836(b)(3)(B), and under Fla. Stat. § 688.005 in an amount up to two times any award made under Fla. Stat. § 688.004, based on Defendants' willful and malicious misappropriation.

9.     Award Plaintiffs attorneys' fees incurred in its prosecution of this action pursuant to 18 U.S.C. § 1836(b)(3) and Fla. Stat. § 688.006.

10.     Grant Fortegra such other and further relief as this Court may deem just and proper.

Respectfully submitted this 14th day of April, 2026.

KILPATRICK TOWNSEND
   & STOCKTON LLP

*/s/ Michael D. McWaters*
Michael D. McWaters
Florida Bar No. 1068690
Susan W. Pangborn (*pro hac vice forthcoming*)
Georgia Bar No. 735027
Jeffrey H. Fisher (*pro hac vice forthcoming*)
Georgia Bar No. 981575
Andrew T. Williamson (*pro hac vice forthcoming*)
Georgia Bar No. 962098

1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
MMcWaters@ktslaw.com
SPangborn@ktslaw.com
JFisher@ktslaw.com
Drew.Williamson@ktslaw.com

*Counsel for Plaintiffs The Fortegra Group, Inc., and LOTSolutions, Inc.*

## VERIFICATION

I, Mark Rattner, am an Executive Vice President and U.S. Chief Underwriting Officer for The Fortegra Group, Inc., and am authorized to make this verification on behalf of The Fortegra Group, Inc., and LOTSolutions, Inc. (collectively "Fortegra"). I have reviewed the foregoing Verified Complaint and am familiar with the facts alleged therein. The facts set forth in the Verified Complaint are true and correct to the best of my knowledge, information, and belief, based upon my personal knowledge where applicable, and upon information provided to me by other Fortegra personnel, records, and investigations where applicable. Fortegra has undertaken a reasonable and ongoing investigation under the circumstances, including review of internal documents, forensic data, and communications, and the allegations reflect the evidence developed to date. To the extent any allegations are based on information and belief, I believe them to be true based on the information currently known to Fortegra. Fortegra reserves the right to supplement or amend the allegations as additional information becomes available.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct and that this Verification was executed in Jacksonville, Florida.

Executed on this 13th day of April, 2026

_____
Mark Rattner