# EXHIBIT A

# CLIENT AGREEMENT

**SCHEDULE**

| TERM | MEANING |
| --- | --- |
| **we**, **us** or **our** | **Pinion Risk Consulting Limited** a company registered in England and Wales. Our company registration number is 14306995.<br><br>Address: 45 Pall Mall, London, England SW1Y 5JG, GB<br><br>Phone: +44 (0)203 916 5775<br><br>Email: LB@pinionltd.com |
| **you** or **your** | **LOTSolutions, Inc.,** a company registered in Delaware, USA.<br><br>Address: 10751 Deerwood Park Boulevard, Suite 200, Jacksonville, FL 32256<br><br>Phone: +01 (904) 673 4897<br><br>Email: jvaag@fortegra.com |
| **Services** | The Services are the following:<br><br>• assisting you by providing actuarial and analytical services upon request, including conducting analysis and generating reports; and<br><br>• performing modelling and projections in order to provide an independent opinion of expected future performance of inward insurance and reinsurance business; and<br><br>• perform modelling and projections in order to provide an independent opinion of optimal outward reinsurance structuring; and<br><br>• provide other ad-hoc actuarial assistance. |
| **Purpose** | The Purpose of the Services is:<br><br>• to provide additional actuarial resource for your International business; and<br><br>• to provide support on your outward reinsurance placements. |
| **Premises** | N/A |
| **Retainer** | A retainer of £7500 per month for the Services. |
| **Expenses** | The Expenses are:<br><br>• any disbursements, reasonably and directly incurred by us and approved in advance by you for the purpose of the supply of the Services. |
| **Payment Terms** | You must pay us the Retainer, any Expenses, and any other amount due and payable under this Agreement as follows:<br><br>**Retainer**: We will issue invoices to you on a monthly basis during the Term, for Services to be performed the following month; and<br><br>**Expenses and all other amounts**: We will issue invoices to you on a monthly basis during the Term, for Expenses and any other amount due and payable under this Agreement incurred during the previous month, and<br><br>you must pay the amount in each invoice, using the payment method set out in the invoice, within 14 days of the date of the invoice, or as otherwise agreed between the Parties. We will not commence the provision of the Services each month until we have received payment of that month's Retainer in full. |
| **Commencement Date** | 1st January 2023 |
| **Term** | Subject to each Party's right to terminate this Agreement in accordance with its terms, this Agreement commences on the Commencement Date and will continue for 12 months (**Initial Term**). On the expiry of the Initial Term, this Agreement will be automatically renewed for subsequent 12 month periods (each a **Renewal** |

|  | |
|---|---|
| | **Period**), unless either Party provides 30 days' written notice before the end of the Initial Term or the end of the then-current Renewal Period (as applicable) that it does not wish to renew this Agreement. |
| **End Date** | The date on which this Agreement expires or is terminated, in accordance with its terms. |
| **Break Date** | The date that is 3 months from the Commencement Date. Following the Break Date, either Party may terminate this Agreement upon thirty (30) days' written notice. |

**EXECUTION**

SIGNED by Laura Baird for and on behalf of Pinion Risk Consulting Limited:

*L. Baird*

Signature

Laura Baird

Name

2.8.23

Date

SIGNED by Michael Vrban for and on behalf of LOTSolutions, Inc.:

Signature

Michael Vrban, Treasurer

Name

2.8.23

Date

**TERMS AND CONDITIONS**

This Agreement is entered into between us and you, together the **Parties** and each a **Party**.

Background

A.    We provide actuarial consultancy services.

B.    Your business requires actuarial support.

C.    This Agreement sets out the terms and conditions under which we will provide our Services to you.

1.    Acceptance and Term of this Agreement

1.1    You accept this Agreement by the earlier of:

(a)    signing and returning this Agreement to us, including by email or any electronic executions platform acceptable to us;

(b)    confirming by email that you accept this Agreement; and

(c)    instructing us (whether orally or in writing) to proceed with the supply of the Services; and

(d)    making part or full payment of the Retainer.

1.2    This Agreement will operate for the Term.

2.    Our supply of the Services

2.1    In consideration of your payment of the Retainer, we will provide the Services in accordance with this Agreement and all applicable Laws (including professional and ethical standards issued by the Institute and Faculty of Actuaries and the UK Financial Reporting Council), whether ourselves or through our Personnel.

2.2    We warrant to you that the Services will be provided using reasonable care and skill.

2.3    We will not be responsible for any Services unless expressly set out in the inclusions in the Schedule.

2.4    If this Agreement expresses a time within which the Services are to be supplied, we will use reasonable endeavours to provide the Services by such time, but you agree that such time is an estimate only, and creates no obligation on us to supply the Services by that time, and may be impacted by circumstances outside of our control, including your delayed provision of information to us, or where we are constrained by professional actuarial requirements.

3.    Commencement

We will commence the supply of the Services within a reasonable time after the later of:

(a)    the Commencement Date;

(b)    the receipt of payment of the first Retainer in full; and

(c)    the satisfaction of any other conditions precedent contemplated by this Agreement.

4.    Variations

4.1    You may request a variation or change to the Services, including the request of additional services (**Variation**), by providing written notice (including by email) to us, with details of the Variation (**Variation Request**). We will not be obliged to comply with a Variation Request unless we accept the Variation Request in writing. The Parties agree to comply with this Agreement as varied by any Variation Request accepted in writing.

4.2    If we consider that any instruction or direction from you constitutes a Variation, then we will not be obliged to comply with such instruction or direction unless a Variation Request has been issued and accepted by us in accordance with clause 4.1.

5.    Premises

Where we agree with you (in the Schedule or otherwise) that you we will provide the Services (or part thereof) at the Premises, you agree to provide us (and our Personnel) with access to the Premises (and the facilities at the Premises) and any other premises as is reasonably necessary for us to provide the Services, free from harm or risk to health or safety:

(a)    at the times and on the dates reasonably requested by us or as agreed between the Parties; and/or

(b)    to enable us to comply with our obligations under this Agreement or at Law.

You agree to pay our additional costs reasonably incurred as a result of you failing to comply with this clause.

6.    Warranties and Representations

6.1    Each Party represents, warrants and agrees that:

(a)    it has full legal capacity, right, authority and power to enter into this Agreement, to perform its obligations under this Agreement, and to carry on its business;

(b)    that this Agreement constitutes a legal, valid and binding agreement, enforceable in accordance with its terms;

(c)    if applicable, it holds a valid company number which has been advised to the other Party; and

(d)    if applicable, it is registered for VAT purposes.

6.2    You represent, warrant and agree:

(a)    to comply with this Agreement and all applicable Laws;

(b)    that all information and documentation that you provide to us in connection with this Agreement is true, correct and complete;

(c)    to comply with our reasonable requests or requirements;

(d)    that you (and to the extent applicable, your Personnel) will provide us with all documentation, information, instructions, cooperation and access reasonably necessary to enable us to provide the Services;

(e)    that you have not relied on any representations or warranties made by us in relation to the Services (including as to whether the Services are or will be fit or suitable for any particular purposes), unless expressly stipulated in this Agreement;

(f)    that no Insolvency Event has occurred in respect of you and that you will immediately notify us if you are (or you are likely to be) the subject of an Insolvency Event;

(g)    that the Services are provided to you solely for the Purpose, and you will not rely on the Services for any purpose other than the Purpose (set out in the Schedule);

(h)    that the Services are provided to you solely for your benefit and you will not (or you will not attempt to) disclose, or provide access to, the Services to third parties without our prior written consent;

(i)    that you will not misrepresent any part of the deliverables we provide to you as part of the Services, including quoting or referring to segments of the deliverables and not presenting them in a complete form;

(j)    that any information, advice, material, work and services (including the Services) provided by us under this Agreement does not constitute legal, financial, merger or due diligence advice; and

(k)    that you acknowledge that we are obliged to adhere strictly to professional and ethical standards issued by the Institute and Faculty of Actuaries and the UK Financial Reporting Council. This means that:

   i.   we may be unable to act or need to discontinue work on a particular case owing to ethical constraints or identification of an unresolvable conflict of interest (as detailed further in clause 12.5); and

   ii.  we are required to perform work to a given quality standard (including our internal quality assurance and peer review processes for our advice) in accordance with our internal and professional actuarial requirements. This may constrain our ability to provide results by targeted dates.

## 7.    Intellectual Property

7.1    As between the Parties:

(a)    we own all Intellectual Property Rights in Our Materials;

(b)    you own all Intellectual Property Rights in Your Materials; and

(c)    nothing in this Agreement constitutes a transfer or assignment of any Intellectual Property Rights in Our Materials or Your Materials.

7.2    As between the Parties, ownership of all Intellectual Property Rights in any New Materials or Improvements will, after payment in full for those New Materials or Improvements, vest in you.

7.3    You grant us a non-exclusive, revocable, worldwide, non-sublicensable and non-transferable right and licence, to use Your Materials that you provide to us, the New Materials and Improvements, solely for the purposes for which they were developed and solely for the performance of our obligations under this Agreement.

7.4    We grant you a non-exclusive, revocable, worldwide, non-sublicensable and non-transferable right and licence, to use Our Materials that we provide to you solely for the purposes for which they were developed and for your use and enjoyment of the Services, as contemplated by this Agreement.

7.5    In the use of any Intellectual Property Rights in connection with this Agreement, you agree that you must not (and you must ensure that your Personnel do not) commit any Intellectual Property Breach. Where you reasonably suspect that such a breach may have occurred, you must notify us immediately.

7.6    This clause 7 will survive termination or expiry of this Agreement.

## 8.    Confidential Information

8.1    Each Receiving Party agrees:

(a)    not to disclose the Confidential Information of the Disclosing Party to any third party;

(b)    to use all reasonable endeavours to protect the Confidential Information of the Disclosing Party from any unauthorised disclosure; and

(c)    to only use the Confidential Information of the Disclosing Party for the purposes for which it was disclosed or provided by the Disclosing Party, and not for any other purpose.

8.2    The obligations in clause 8.1 do not apply to Confidential Information that:

(a)    is required to be disclosed in order for the Parties to comply with their obligations under this Agreement;

(b)    is authorised to be disclosed by the Disclosing Party;

(c)    is in the public domain and/or is no longer confidential, except as a result of a breach of this Agreement; or

(d)    must be disclosed by Law or by a regulatory authority, including under subpoena, or by the rules of any listing authority or stock exchange on which the Receiving Party's shares are listed or traded.

8.3    Each Party agrees that monetary damages may not be an adequate remedy for a breach of this clause 8. A Party is entitled to seek an injunction, or any other remedy available at law or in equity, at its discretion, to protect itself from a breach (or continuing breach) of this clause 8.

8.4    This clause 8 will survive the termination of this Agreement.

## 9.    Limitations on and exclusions to our liability

9.1    Neither Party may benefit from the limitations and exclusions set out in this clause 9 in respect of any liability arising from its deliberate default.

9.2    The restrictions on liability in this clause 9 apply to every liability arising under or in connection with this Agreement including liability in statute, contract, equity, tort (including negligence), misrepresentation, restitution, indemnity or otherwise.

9.3    Nothing in this Agreement limits any Liability which cannot legally be limited, including Liability for:

(a)    death or personal injury caused by negligence;

(b)    fraud or fraudulent misrepresentation;

(c)    breach of the terms implied by section 2 of the Supply of Goods and Services Act 1982 (title and quiet possession); and

(d)    defective Services under the Consumer Protection Act 1987.

9.4 To the maximum extent permitted by law, we will not be liable for, and you waive and release us from and against, any Liability caused or contributed to by, arising from or connected with:

(a) your provision of incorrect information or data to us or your failure to provide us with relevant information or data;

(b) any use or application of the Services (or deliverables) by a person or entity other than you, or other than as reasonably contemplated by this Agreement; and/or

(c) your reliance on the Services (or deliverables) for any purpose that is not the Purpose.

9.5 Subject to clauses 9.1 (no limitation in respect of deliberate default) and 9.3 (liability which cannot legally be limited), but despite anything else to the contrary, to the maximum extent permitted by law:

(a) neither Party will be liable for any Consequential Loss;

(b) a Party's liability for any Liability under this Agreement will be reduced proportionately to the extent the relevant Liability was caused or contributed to by the acts or omissions of the other Party (or any of its Personnel), including any failure by that other Party to mitigate its loss; and

(c) our aggregate liability for any Liability arising from or in connection with this Agreement will be limited to us resupplying the Services to you or, in our sole discretion, to us repaying you the amount of the Retainer paid by you to us in respect of the supply of the relevant Services to which the Liability relates, and our aggregate liability for all Liability arising from or in connection with this Agreement will not exceed an amount reflecting 100% of the Fees paid by you to us in the first 6 months of the Term.

9.6 We have given commitments as to the compliance of the Services with this Agreement and applicable Laws in clause 2. In view of these commitments, the terms implied by sections 3, 4 and 5 of the Supply of Goods and Services Act 1982 are, to the maximum extent permitted by law, excluded from this Agreement.

9.7 This clause 9 will survive the termination or expiry of this Agreement.

## 10. Termination

10.1 Following the Initial Term, either party hereto may terminate this Agreement for any or no reason by providing at least ninety (90) days' written notice. In the event of a Termination for Convenience, the Parties will continue to fulfill their respective duties under this Agreement throughout the notice period.

10.2 We may terminate this Agreement if there are any ethical grounds which we consider require us to cease acting for you, such as an inappropriate, improper or unlawful request, or a conflict of interest, or if in our sole discretion we consider it is no longer appropriate to act for you.

10.3 This Agreement will terminate immediately upon written notice by a Party (**Non-Defaulting Party**) if:

(a) the other Party (**Defaulting Party**) breaches a material term of this Agreement and that breach has not been remedied within 10 Business Days of the Defaulting Party being notified of the breach by the Non-Defaulting Party; or

(b) the Defaulting Party is unable to pay its debts as they fall due.

10.4 Upon expiry or termination of this Agreement:

(a) we will immediately cease providing the Services;

(b) to the maximum extent permitted by law, you agree that any payments made by you to us are not refundable to you; and

(c) you are to pay for all Services provided prior to termination, including Services which have been provided and have not yet been invoiced to you, and all other amounts due and payable under this Agreement;

(d) by us pursuant to clause 10.3, you also agree to pay us our additional costs, reasonably incurred, and which arise directly from such termination (including legal fees, debt collector fees and mercantile agent fees);

(e) you agree to grant us such rights of access to any premises where the Services are located to allow us (or our Personnel) to recover or repossess any materials or items belonging to us; and

(f) you agree to promptly return (where possible), or delete or destroy (where not possible to return), any information, documentation or material owned by us that is in your possession or control, subject to any rights you may have to any Intellectual Property in accordance with clause 7.

10.5 We will retain your documents (including copies) as required by law or regulatory requirements. Your express or implied agreement to this Agreement constitutes your authority for us to retain or destroy documents in accordance with the statutory periods, or on expiry or termination of this Agreement.

10.6 Termination of this Agreement will not affect any rights or liabilities that a Party has accrued under it.

10.7 This clause 10 will survive the termination or expiry of this Agreement.

## 11. General

11.1 **Amendment:** This Agreement may only be amended by written instrument executed by the Parties.

11.2 **Assignment:** Subject to clause 12.3, a Party must not assign or deal with the whole or any part of its rights or obligations under this Agreement without the prior written consent of the other Party (such consent is not to be unreasonably withheld).

11.3 **Assignment of Debt:** You agree that we may assign or transfer any debt owed by you to us, arising under or in connection with this Agreement, to a debt collector, debt collection agency, or other third party.

11.4 **Contracts (Rights of Third Parties) Act 1999:** Notwithstanding any other provision of this Agreement, nothing in this Agreement confers or is intended to confer

any right to enforce any of its terms on any person who is not a party to it.

11.5 **Conflict of Interest**: Prior to entering into, and during, the engagement with you, we will use our best endeavours to ensure there is no conflict of interest. You must immediately advise us if, at any time during the engagement, you become aware of a conflict of interest or a potential conflict of interest. If a conflict of interest or a potential conflict of interest arises, we will notify you and we will take appropriate steps to resolve the conflict, as permitted by law.

11.6 **Counterparts:** This Agreement may be executed in any number of counterparts that together will form one instrument.

11.7 **Disputes:** A Party may not commence court proceedings relating to any dispute, controversy or claim arising from, or in connection with, this Agreement (including any question regarding its existence, validity or termination) (**Dispute**) without first meeting with a senior representative of the other Party to seek (in good faith) to resolve the Dispute. If the Parties cannot agree how to resolve the Dispute at that initial meeting, either Party may refer the matter to a mediator. If the Parties cannot agree on who the mediator should be, either Party may ask the Law Society of the United Kingdom to appoint a mediator. The mediator will decide the time, place and rules for mediation. The Parties agree to attend the mediation in good faith, to seek to resolve the Dispute. The costs of the mediation will be shared equally between the Parties. Nothing in this clause will operate to prevent a Party from seeking urgent injunctive or equitable relief from a court of appropriate jurisdiction.

11.8 **Email:** You agree that we are able to send electronic mail to you and receive electronic mail from you. To the maximum extent permitted by law, you release us from any Liability you may have as a result of any unauthorised copying, recording, reading or interference with that document or information after transmission, for any delay or non-delivery of any document or information and for any damage caused to your system or any files by a transfer.

11.9 **Entire agreement:** This Agreement contains the entire understanding between the Parties and the Parties agree that no representation or statement has been made to, or relied upon by, either of the Parties, except as expressly stipulated in this Agreement, and this Agreement supersedes and extinguishes all previous discussions, communications, negotiations, understandings, representations, warranties, commitments and agreements, whether written or oral, in respect of its subject matter. Each Party agrees that it will have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement.

11.10 **Further assurance:** Each Party must promptly do all things and execute all further instruments necessary to give full force and effect to this Agreement and their obligations under it.

11.11 **Force Majeure:** To the maximum extent permitted by law, neither Party will be liable for any delay or failure to perform their respective obligations under this Agreement if such delay or failure is caused or contributed to by a Force Majeure Event. This clause will not apply to a Party's

obligation to pay any amount that is due and payable to the other Party under this Agreement.

11.12 **Governing law:** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule. Each party irrevocably submits to the exclusive jurisdiction and venue of the federal and state courts located in Duval County, Florida, in any legal suit, action, or proceeding arising out of or based upon this Agreement or the services provided hereunder.

11.13 **Notices:** Any notice given under this Agreement must be in writing addressed to the relevant address last notified by the recipient to the Parties. Any notice may be sent by standard post or email, and will be deemed to have been served on the expiry of 48 hours in the case of post, or at the time of transmission in the case of transmission by email.

11.14 **Online execution:** This Agreement may be executed by means of such third party online document execution service as we nominate subject to such execution being in accordance with the applicable terms and conditions of that document execution service.

11.15 **Publicity:** You agree that we may advertise or publicise the broad nature of our supply of the Services to you, including on our website or in our promotional material.

11.16 **Privacy:** We will only use your personal information as set out in our privacy notice. You can find our privacy notice at the end of the contract.

11.17 **Relationship of Parties:** This Agreement is not intended to create a partnership, joint venture, employment or agency relationship between the Parties.

11.18 **Severance:** If a provision of this Agreement is held to be void, invalid, illegal or unenforceable, that provision is to be read down as narrowly as necessary to allow it to be valid or enforceable, failing which, that provision (or that part of that provision) will be severed from this Agreement without affecting the validity or enforceability of the remainder of that provision or the other provisions in this Agreement. If any provision or part-provision of this Agreement is deemed deleted under this clause 12.18, the Parties will negotiate in good faith to agree a replacement provision that, to the greatest extent possible, achieves the intended commercial result of the original provision.

12. Definitions

In this Agreement, unless the context otherwise requires, capitalised terms have the meanings given to them in the Schedule, and:

**Agreement** means these terms and conditions and any documents attached to, or referred to in, each of them.

**Business Day** means a day on which banks are open for general banking business in England and Wales, excluding Saturdays, Sundays and public holidays.

**Confidential Information** includes information which:

(a) is disclosed to the Receiving Party in connection with this Agreement at any time;

(b) is prepared or produced under or in connection with this Agreement at any time;

(c) relates to the Disclosing Party's business, assets or affairs; or

(d)    relates to the subject matter of, the terms of and/or any transactions contemplated by this Agreement,

whether or not such information or documentation is reduced to a tangible form or marked in writing as "confidential", and howsoever the Receiving Party receives that information.

**Consequential Loss** includes any consequential loss, indirect loss, real or anticipated loss of profit, loss of benefit, loss of revenue, loss of business, loss of goodwill, loss of opportunity, loss of savings, loss of reputation, loss of use and/or loss or corruption of data, whether under statute, contract, equity, tort (including negligence), indemnity or otherwise. The Parties acknowledge and agree that your obligation to pay us the Retainer under this Agreement will not constitute "Consequential Loss" for the purposes of this definition.

**Disclosing Party** means the party disclosing Confidential Information to the Receiving Party.

**Dispute** has the meaning given in clause 12.7.

**Force Majeure Event** means any event or circumstance which is beyond a Party's reasonable control including but not limited to, acts of God including fire, hurricane, typhoon, earthquake, landslide, tsunami, mudslide or other catastrophic natural disaster, civil riot, civil rebellion, revolution, terrorism, insurrection, militarily usurped power, act of sabotage, act of a public enemy, war (whether declared or not) or other like hostilities, ionising radiation, contamination by radioactivity, nuclear, chemical or biological contamination, any widespread illness, quarantine or government sanctioned ordinance or shutdown, pandemic (including COVID-19 and any variations or mutations to this disease or illness) or epidemic.

**Improvements** means any development, modification, adaptation or improvement of Your Materials or any New Materials made by or on behalf of either Party (or any of their respective Personnel), or in respect of which Intellectual Property Rights are acquired by, either Party during the Term.

**Insolvency Event** means where if a Party takes any step or action (or any analogous step or action) in connection with:

(a)    its entering administration, provisional liquidation or any composition or arrangement with its creditors (other than in relation to a solvent restructuring);

(b)    applying to court for or obtaining a moratorium under Part A1 of the Insolvency Act 1986;

(c)    being wound up (whether voluntarily or by order of the court, unless for the purpose of a solvent restructuring); or

(d)    having a receiver appointed to any of its assets or ceasing to carry on business,

or if the step or action is taken in another jurisdiction, in connection with any analogous procedure in the relevant jurisdiction.

**Intellectual Property** means any copyright, registered or unregistered designs, patents or trade marks, business names, get-up, goodwill, domain names, know-how, inventions, processes, trade secrets or Confidential Information, circuit layouts, software, computer programs, databases or source codes, including any application, or right

to apply, for registration of, and any improvements, enhancements or modifications of, the foregoing.

**Intellectual Property Breach** means any breach by you (or any of your Personnel) of any of our Intellectual Property Rights (or any breaches of third-party rights, including any Intellectual Property Rights of third parties), including using or exploiting our Intellectual Property for purposes other than as expressly stated in this Agreement (including, without limitation, using our Intellectual Property for commercial purposes or on-selling our Intellectual Property to third parties).

**Intellectual Property Rights** means for the duration of the rights in any part of the world, any industrial or intellectual property rights, whether registrable or not, and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which subsist or will subsist now or in the future, including in respect of Intellectual Property.

**Laws** means all applicable laws, regulations, codes, guidelines, policies, protocols, consents, approvals, permits and licences, and any requirements or directions given by any government or similar authority with the power to bind or impose obligations on the relevant Party in connection with this Agreement or the supply of the Services.

**Liability** means any expense, cost, liability, loss, damage, claim, notice, entitlement, investigation, demand, proceeding or judgment (whether under statute, contract, equity, tort (including negligence), misrepresentation, restitution, indemnity or otherwise), howsoever arising, whether direct or indirect and/or whether present, unascertained, future or contingent and whether involving a third party or a Party to this Agreement or otherwise.

**Moral Rights** means any moral rights, including those conferred by Chapter IV of the Copyright, Designs and Patents Act 1988.

**New Materials** means all Intellectual Property developed, adapted, modified or created by or on behalf of us or you or any of your or our respective Personnel in connection with this Agreement or the supply of the Services, whether before or after the date of this Agreement, but excludes Our Materials and Your Materials.

**Our Materials** means all work, models, algorithms, analytics, templates, processes, technologies, strategies, materials, information, documentation, specifications and services that we may provide to you under this Agreement, and which may contain material which is owned by or licensed to us, and is protected by UK and international laws.

**Personnel** means, in respect of a Party, any of its employees, consultants, suppliers, subcontractors or agents, but in respect of you, does not include us.

**Receiving Party** means the party receiving Confidential Information from the Disclosing Party.

**Retainer** means the Retainer set out in the Schedule, as adjusted in accordance with this Agreement.

**Schedule** means the schedule to this Agreement.

**Services** means the services set out in the Schedule, and as adjusted in accordance with this Agreement.

**Variation** has the meaning given in clause 4.1.

**Variation Request** has the meaning given in clause 4.1.

**VAT** means value added tax or any equivalent tax chargeable in the UK.

**Your Materials** means all work, models, processes, technologies, strategies, materials, information, documentation and services (including Intellectual Property), owned or licensed by you or your Personnel before the Commencement Date and/or developed by or on behalf of you or your Personnel independently of this Agreement.

13.   Interpretation

In this Agreement, unless the context otherwise requires:

(a)     a reference to this Agreement or any other document includes the document, all schedules and all annexures as novated, amended, supplemented, varied or replaced from time to time;

(b)     a reference to any legislation or law includes subordinate legislation or law and all amendments, consolidations, replacements or re-enactments from time to time;

(c)     a reference to a natural person includes a body corporate, partnership, joint venture, association, government or statutory body or authority or other legal entity and vice versa;

(d)     no clause will be interpreted to the disadvantage of a Party merely because that Party drafted the clause or would otherwise benefit from it;

(e)     a reference to a party (including a Party) to a document includes that party's executors, administrators, successors, permitted assigns and persons substituted by novation from time to time;

(f)     a reference to a covenant, obligation or agreement of two or more persons binds or benefits them jointly and severally;

(g)     any obligation on a Party not to do something includes an obligation not to allow that thing to be done;

(h)     a reference to time is to local time in London; and a reference to £ or pounds refers to the currency of the United Kingdom from time to time.